UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ERIC PALMORE-LETT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 11 CV 05293 |
| | ) |
| VILLAGE OF SCHAUMBURG, | ) Judge Rebecca R. Pallmeyer |
| OFFICER PORADZISZ, OTHER | ) |
| UNKNOWN AGENTS AND OFFICERS | ) |
| OF THE VILLAGE OF SCHAUMBURG, | ) |
| HARPER COLLEGE, OFFICER LARSON | ) |
| BADGE #815 and UNKNOWN AGENTS | ) |
| AND OFFICERS OF HARPER COLLEGE | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Eric Palmore-Lett alleges that he was unlawfully arrested by officers of the Village of Schaumburg and Harper College police departments. Palmore-Lett filed this lawsuit in state court, alleging federal and state claims against Schaumburg Detective Bryan J. Poradzisz and Kristopher Larson, a Harper College police officer. Defendants removed the case to this court and the parties have stipulated to dismissal of Plaintiff's state law claims. What is left are Plaintiff's claims of false arrest and unreasonable seizure in violation of the Fourth Amendment against the individual Defendants and Plaintiff's *Monell* claims against the Village of Schaumburg and Harper College. Defendants seek summary judgment on those claims. Because the court concludes that the officers' conduct was supported by probable cause, their motions are granted.

**BACKGROUND**

The following facts are drawn from the pleadings and the parties' Local Rule 56.1 submissions.[1]

---

[1] Defendants contend that Plaintiff failed to comply with Local Rule 56.1 and ask this court to strike portions of Plaintiff's 56.1(b) Statement of Facts. It is within the court's discretion to require strict compliance with the Local Rules. *Bordelon v. Chi. Sch. Reform Bd. of Trustees*, 233

(continued...)

**I.      Investigation of Zaire Harris**

In early May of 2010, Detective Bryan Poradzisz, who was employed by the Schaumburg Police Department (hereinafter "SPD"), began investigating reports of residential burglaries and an attempted burglary at the Remington Place Apartments, an apartment complex located in the Village of Schaumburg.  (Vill. Defs.' 56.1(a) [36] at ¶ 8.)  According to those reports, the offender forcibly entered residences and stole checks that he made payable to "Zaire Harris" and deposited at various ATMs.  (*Id.* ¶¶ 8, 11.)  In a May 12, 2010 interview, the property manager of the apartment complex told Poradzisz that a man named Zaire Harris (hereinafter "Harris") shared an apartment in the complex with four Harper College students.  (*Id.* ¶ 10.)

As part of his investigation, Detective Poradzisz was able to obtain video images of a person cashing the forged checks.[2]  (*Id.* ¶ 11.)  The images, while not of good quality (Harper Coll. Defs.' Resp. to Pl.'s 56.1(b) [51] at ¶ 11), depicted an African-American male with dreadlocks.  (Vill. Defs.' 56.1(a) ¶ 11.)  When Poradzisz showed the images to two of the burglary victims, they recognized the man in the images as a neighbor who lived in the apartment complex.  (*Id.* ¶ 15.)  The victims told Poradzisz that they had spoken to the neighbor in the past and that he had told them he was a student at Harper College.  (Poradzisz Decl., Ex. B to Vill. Defs.' 56.1(a) at ¶ 8.)

On June 7, 2010, Detective Poradzisz returned to the apartment complex and called on the unit in which Harris reportedly lived.  (Vill. Defs.' 56.1(a) ¶ 13.)  Poradzisz spoke with two individuals who lived in the unit and learned that Harris had recently moved out.  (*Id.*)  One of the former roommates confirmed that Harris was enrolled at Harper College and told Detective Poradzisz that

---

[1](...continued)
F.3d 524, 527 (7th Cir. 2000).  Plaintiff is not in strict compliance; he exceeded Local Rule 56.1's limit of 40 paragraphs without leave of court, and he included argumentative responses in his submission.  The court nevertheless declines to strike any portion of Plaintiff's pleadings at this time.

[2]     The parties have not identified the source of the video, but the court presumes it was made by security cameras at one of the banks and/or ATMs where the checks were deposited.

Harris had a class in room D226 that met Monday through Thursday in the morning. (*Id.* ¶ 14.) Poradzisz also obtained additional information from the Secretary of State, confirming that Harris had a driver's license, which revealed that Harris was a 20-year-old African-American male who stood 5 feet 10 inches tall and weighed 175 pounds. (Poradzisz Decl. ¶ 9.) (Whether Poradzisz had access to Harris's driver's license photograph is not clear from the record.)

## II.  Seizure of Plaintiff

On June 23, 2010, at about 9:00 a.m., Detective Poradzisz and Detective Kwiatkowski, another SPD detective, drove to Harper College to locate Harris. (Vill. Defs.' 56.1(a) ¶ 16.) Upon arriving at Harper College, Poradzisz and Kwiatkowski went to the Harper College Police Station and spoke with Officer Joe Hernandez. (*Id.* ¶ 17.) It is undisputed that Officer Hernandez confirmed that Harris was enrolled in a class that met in room D226, which was in progress and scheduled to end at 9:30 that morning. (*Id.*)

Harper College dispatched Defendant Officer Kristopher Larson to meet the SPD detectives in Building D. (Harper Coll. Defs.' 56.1(a) [40] at ¶ 6.) Larson proceeded to Building D, where he met Detectives Poradzisz and Kwiatkowski and a second Harper College Police Officer, Rich Nowaczyk. (Pl.'s 56.1(b) [45-2] at ¶ 10.) Detective Poradzisz told the Harper College officers that he was looking for Zaire Harris, who was believed to be in classroom D226. (Harper Coll. Defs.' 56.1(a) ¶¶ 7-8.) The SPD detectives and Harper College officers arrived at room D226 as the class was about to end. (*Id.* ¶¶ 11-12.) There were approximately 18-25 students in the class. (Vill. Defs.' 56.1(a) ¶ 18.) Plaintiff was one of two African-American males in the classroom. (*Id.* ¶ 21.) At that time, Plaintiff was 19 years old, 5 feet 11 inches tall, and weighed 188 pounds. (Palmore-Lett Dep., Ex. 3 to Pl.'s 56.1(b) at 5:24-6:17.) Plaintiff also wore his hair in dreadlocks that were approximately 2 to 3 inches long–not the same length as Harris's, though the parties do not say whether Harris's dreadlocks were shorter or longer. (Harper Coll. Defs.' 56.1(a) ¶¶ 11, 46, 47.)

First, the Harper College officers entered the classroom. (Pl.'s 56.1(b) ¶ 16.) Officer Larson

approached Plaintiff and asked, "are you Zaire Harris?" (*Id.*) Plaintiff responded, "You've got the wrong guy." (*Id.*) Then Detective Poradzisz entered the classroom and approached the other African-American male; this other student was approximately 6 feet tall and did not wear dreadlocks. (*Id.* ¶¶ 20-23.) When Poradzisz asked the other student if he was Harris, the student responded that he was not and produced an identification card. (*Id.* ¶¶ 21-22.) Poradzisz then approached Plaintiff. Poradzisz identified himself as a Village of Schaumburg detective conducting a burglary investigation and told Plaintiff that he believed Plaintiff matched the description of the suspect. (Vill. Defs.' 56.1(a) ¶ 27.) Poradzisz asked Plaintiff for his name, and when Plaintiff replied that his name was Eric (*id.* ¶ 28), Poradzisz asked Plaintiff for his identification. (Pl.'s 56.1(b) ¶ 27.)

Plaintiff and Defendants present divergent accounts of what happened next. Plaintiff alleges that he did not have his identification with him and explained that it was in his car, in the parking lot. (*Id.*) Plaintiff and Detective Poradzisz agree that Plaintiff volunteered to retrieve his identification from his vehicle, and that Detective Poradzisz told Plaintiff that the officers would have to walk him to the parking lot. (Pl.'s 56.1(b) ¶¶ 27-28; Vill. Defs.' Resp. to Pl.'s 56.1(b) [48] at ¶ 48.) Officer Larson testified that Plaintiff refused to cooperate with the officers and refused to go to his vehicle to retrieve his identification. (Larson Dep., Ex. D to Harper Coll. Defs.' 56.1(a) at 39:8-40:15.) While Plaintiff insists he was not belligerent, boisterous, or combative (Pl.'s 56.1(b) ¶ 29), Defendants claim that Plaintiff became agitated and raised his voice during the encounter. (Vill. Defs.' 56.1(a) ¶ 35; Harper Coll.'s Defs.' 56.1(a) ¶ 20.) Professor Daniel Loprieno, the instructor of the class, testified that both Plaintiff and the officers appeared upset and raised their voices during the encounter. (Loprieno Dep., Ex. 4 to Pl.'s 56.1(b) at 29:14-33:23.)

Shortly after asking for Plaintiff's identification and while Plaintiff and the other officers were still in the classroom, Poradzisz handcuffed Plaintiff. (Palmore-Lett Dep. 35:7-11.) Poradzisz claims this happened only after Professor Loprieno was asked if he could identify the Plaintiff. (Vill.

Defs.' 56.1(a) ¶ 32-36.) Officer Larson testified, however, that Plaintiff was handcuffed before Loprieno was asked to identify him. (Larson Dep. 40:5-18, 45:6-17.) Loprieno himself recalled that he was asked to identify Plaintiff before Plaintiff was handcuffed. (Loprieno Dep. 36:15-37:8.) While the parties disagree about exactly when Plaintiff was handcuffed, it is undisputed that Loprieno was unable to identify Plaintiff, as this was a summer class and the term had only just begun. (Vill. Defs.' 56.1(a) ¶ 33.)

Although he did not know Plaintiff's name, Loprieno did recognize Plaintiff as a Harper College football player and suggested that the football coach, Professor Geoff Durian, who was teaching a class in the same building, could identify the Plaintiff. (Vill. Defs.' 56.1(a) ¶ 34; Loprieno Dep. 35:3-36:18.) The four officers, Plaintiff, and Professor Loprieno all proceeded to an open lounge area in front of lecture halls in Building D known as the "D knuckle." (Pl.'s 56.1(b) ¶ 39.) Detective Poradzisz placed Plaintiff, still in handcuffs, in a chair in the lounge, while Professor Loprieno stopped in a nearby classroom to find Professor Durian. (*Id.* ¶¶ 39, 42.) Professor Durian emerged from the classroom and identified Plaintiff as Eric Palmore-Lett. (*Id.* ¶ 44.) Detective Poradzisz then went to his car to retrieve a photograph of the suspect. (*Id.* ¶ 46.) He returned a short time later and showed the photograph to Professor Durian, and Durian recognized the individual pictured in the photograph as Zaire Harris, who was also on the Harper College football team. (Pl.'s 56.1(b) ¶¶ 47-48; Durian Dep., Ex. F to Harper Coll. Defs.' 56.1(a) at 22:23-23:9.) At that point, Poradzisz uncuffed and released Plaintiff. (Pl.'s 56.1(b) ¶ 48.) The duration of the incident, from the moment the officers first approached Plaintiff until they removed the handcuffs and released him, was about 10 to 15 minutes. (Vill. Defs.' 56.1(a) ¶ 47.) Plaintiff was in handcuffs for approximately ten of those minutes. (*Id.* ¶ 48.)

Plaintiff's Rule 56.1 Statement of Facts contains additional information regarding certain changes Officer Larson made to the incident report that he prepared after the encounter with Plaintiff. (Pl.'s 56.1(b) ¶¶ 54-64.) Officer Larson created his original report on the day of the

incident. (*Id.* ¶ 54.) Larson's supervisor, Officer Tom Koch, reviewed the report and directed Larson to include additional information, such as the proximity of the parties to the events that took place, the justification for handcuffing Plaintiff, and the nature and purpose of the force used in the encounter. (*Id.* ¶¶ 57-59.) Officer Koch also requested that Officer Larson address the following issues in his narrative: where Plaintiff was taken; how and by whom Plaintiff was transported; whether Plaintiff was paraded publicly or forcibly moved; and whether Plaintiff was humiliated. (*Id.* ¶ 61.) Over the course of the following week, Officer Larson made the requested revisions and the file was closed on June 30, 2010. (*Id.* ¶¶ 56, 58.)

Plaintiff contends that Officer Larson "changed his version of events from his initial report" (Pl.'s Mem. in Opp'n to Harper Coll. Defs.' Mot. for Summ. J. [45-10] at 3); in his view, the changes are "conflicting statements" that create genuine issues of material fact concerning Officer Larson's testimony, the report, and Plaintiff's disposition during the incident. (*Id.* at 4.) The record contains just one copy of the report, presumably the revised version. As the court reads the record, it appears that Officer Koch was requesting additional detail regarding the incident–not asking Officer Larson to change his story. Without comparing the original draft with the final version, the court cannot determine conclusively whether the changes were more substantive. At this stage, however, the court is not permitted to "judge the credibility of the witnesses, evaluate the weight of the evidence, or determine the truth of the matter." *Gonzalez v. City of Elgin*, 578 F.3d 526, 529 (7th Cir. 2009) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 249–50 (1986)). Accordingly, in deciding whether there are disputes of fact requiring denial of Defendants' motions, the court will confine its assessment to those facts in Officer Larson's report that are not contested by Plaintiff.

## DISCUSSION

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could

return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In considering a motion for summary judgment, the court construes all facts and draws all reasonable inferences in the light most favorable to the nonmoving party. *Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594, 600 (7th Cir. 2009).

**I.     42 U.S.C. § 1983**

Plaintiff brought his remaining claims against Poradzisz and Larson pursuant to Title 42 U.S.C. § 1983. Section 1983 "creates a federal cause of action for 'the deprivation, under color of [state] law, of a citizen's rights, privileges, or immunities secured by the Constitution and laws of the United States.'" *Ledford v. Sullivan*, 105 F.3d 354, 356 (7th Cir.1997) (quoting *Livadas v. Bradshaw*, 512 U.S. 107, 132 (1994)). While Section 1983 does not create substantive rights, it serves as a "means for vindicating federal rights conferred elsewhere." *Id.* (citation omitted). The issue is whether the seizure of Plaintiff violated his Fourth Amendment rights. Defendants argue that they are entitled to summary judgment because: (1) Poradzisz and Larson had reasonable suspicion to detain and/or probable cause to arrest Plaintiff; or (2) if they did not have reasonable suspicion or probable cause, Poradzisz and Larson are nevertheless entitled to qualified immunity.

    **A.     Fourth Amendment**

The Fourth Amendment "guarantees the privacy, dignity, and security of persons against certain arbitrary and invasive acts by officers of the Government." *City of Ontario v. Quon*, ___ U.S. ___, 130 S. Ct. 2619, 2627 (2010) (citation and quotation omitted). A Fourth Amendment seizure occurs when a police officer's actions restrain a person's freedom to walk away from the encounter. See *United States v. Mancillas*, 183 F.3d 682, 695 (7th Cir.1999) (citation and quotation omitted). The Fourth Amendment requires that all such seizures be reasonable. *United States v. Jennings*, 544 F.3d 815, 818 (7th Cir. 2008) (citing *Illinois v. McArthur*, 531 U.S. 326, 330 (2001)). Courts have recognized two types of seizures that are relevant here: (1) arrest, requiring the police to have probable cause to believe the person has committed a crime or is committing a crime; and (2) an

7

investigatory stop, limited to a brief non-intrusive detention, based on reasonable suspicion that the person has committed or is committing a crime (often referred to as a *Terry* stop). *United States v. Johnson*, 910 F.2d 1506, 1508 (7th Cir.1990) (citing *Terry v. Ohio*, 392 U.S. 1, 21 (1968)).

A threshold dispute is whether Plaintiff was arrested, as he contends, or merely detained. Plaintiff alleges that his encounter with Poradzisz and Larson was an arrest (Pl.'s Compl., Ex. 1 at pp 4-16 to Vill. Defs.' Notice of Removal [3], at ¶ 14), which required probable cause. Defendants acknowledge that they handcuffed and detained Plaintiff for a short period of time, but note that they released him after Poradzisz determined he was not the subject sought. This was not an arrest, Defendants urge, but rather a detention, for which the officers required only reasonable suspicion. (Vill. Defs.' Mem. in Supp. of Mot. for Summ. J. [35] at 8; Harper Coll. Defs.' Mem. in Supp. of Mot. for Summ. J. [41] at 9.) It is undisputed that Plaintiff was detained for just ten to fifteen minutes. (Vill. Defs.' 56.1(a) ¶ 48.) Nor is there any evidence that Plaintiff was ever placed in a police car, transported to a police station, or told that he was under arrest.

While the circumstances surrounding the seizure of Plaintiff may not have been tantamount to those of a formal arrest, this court will assume *arguendo* that Plaintiff was arrested and determine whether there was probable cause for the arrest.

### B.  Unreasonable Seizure

In the case of a mistaken identity, "the arrest is constitutional if the officers: (1) have probable cause to arrest the person sought; and (2) reasonably believe that the person arrested is the person sought." *Catlin v. City of Wheaton*, 574 F.3d 361, 365 (7th Cir. 2009) (citing *Hill v. Cal.*, 401 U.S. 797, 802 (1971)). Officers have probable cause to arrest when "the facts and circumstances within their knowledge and of which they have reasonably trustworthy information are sufficient to warrant a prudent person in believing that the suspect has committed an offense." *Williams v. Rodriguez*, 509 F.3d 392, 398 (7th Cir. 2007) (citation and internal quotation omitted). "'Probable cause is a fluid concept based on common-sense interpretations of reasonable police

officers as to the totality of the circumstances' known at the time the event occurred." *United States v. Ellis*, 499 F.3d 686, 689 (7th Cir. 2007) (quoting *United States v. Breit*, 429 F.3d 725, 728 (7th Cir. 2007). This is an objective test. The court asks whether a reasonable officer would have believed the person had committed a crime. *Rodriguez*, 509 F.3d at 399. Furthermore, "[t]he officers' subjective motivations are irrelevant so long as they have probable cause to justify the search and seizure." *United States v. Burnside*, 588 F.3d 511, 517 (7th Cir. 2009). If the objective test is satisfied, "the arrest is lawful even if the belief would have been mistaken." *Kelley v. Myler*, 149 F.3d 641, 646 (7th Cir.1998) (citation and quotation omitted).

Plaintiff argues that the officers did not have probable cause to arrest him. Plaintiff has not, however, argued that the officers lacked probable cause to arrest Harris, and the undisputed facts would defeat any such argument: The stolen checks were made out to Zaire Harris. (Vill. Defs.' 56.1(a) ¶ 8.) Images showed that the individual who deposited the checks was an African-American male with dreadlocks. (*Id.* ¶ 11.) When these images were shown to victims, they were able to identify the person depicted in the images as a resident of the apartment complex where the burglaries took place and a student at Harper College. (*Id.* ¶ 15.) Detective Poradzisz corroborated that Harris had lived in the complex and was a student at Harper College. (*Id.* ¶¶ 10, 13-14.) When Poradzisz went to Harper College looking for Harris, he was armed with reasonably trustworthy information, verified through multiple sources, that Harris was involved in the alleged burglaries.

Although the officers had probable cause to arrest Harris, they instead mistakenly arrested Plaintiff. Under such circumstances, officers are liable only if they lacked a reasonable belief that the person arrested was the person sought. *Catlin*, 574 F.3d at 365. Here again, courts apply an objective test, asking, "would the facts available to the officers at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *United States v. Mancillas*, 183 F.3d 682, 695-96 (7th Cir.1998) (quoting *Terry*, 392 U.S. at 21-22).

9

Officers are not "required to show that they knew *with certainty* that the person arrested was the person they were seeking." *Catlin*, 574 F.3d at 366 (emphasis in original). Rather, they need only demonstrate that their actions "were reasonable under the circumstances." *Id*. The test is met here. By the time Detective Poradzisz's investigation led him to Harper College, he had images of the person who deposited the stolen checks. (Vill. Defs.' 56.1(a) ¶ 11.) In addition to the images, which were admittedly not of good quality (Harper Coll. Defs.' 56.1(a) ¶ 11), Poradzisz had obtained a reliable physical description of Harris from Harris's driver's license. (Poradzisz Decl. ¶ 9.)

More importantly, Detective Poradzisz had reason to believe he would find Harris in classroom D226 that very morning. Multiple sources had confirmed that Harris was a student at Harper College. (Vill. Defs.' 56.1(a) ¶¶ 8, 14-15.) Harris's former roommate gave Poradzisz the time and location of a class Harris attended. (*Id*. ¶ 15.) Moreover, when Poradzisz arrived at Harper College, he met with the Harper College Police and corroborated that Harris was indeed scheduled to be in classroom D226 that morning. (*Id*. ¶ 17.) When the officers entered the classroom, they were confronted with a relatively small group of approximately 18 to 25 students, only two of whom were African-American males. (*Id*. ¶¶ 18, 21.) Poradzisz approached the first African-American male, who was approximately six feet tall and did not wear dreadlocks. (*Id*. ¶¶ 20-23.) Poradzisz checked this student's identification and confirmed he was not Harris. (*Id*. ¶¶ 20-22.) Plaintiff, the only remaining African-American male in the classroom, was 19 years old, 5 feet 11 inches tall, and weighed about 188 pounds. (Palmore-Lett Dep. 5:24-6:17.) Plaintiff's appearance was thus reasonably similar to that of Harris, whose driver's license reflected that he was 20 years old, 5 foot 10 inches tall, and 175 pounds. (Poradzisz Decl. ¶ 9.) Plaintiff also wore his hair in dreadlocks, albeit at a different length than Harris. (Harper Coll. Defs.' 56.1(a) ¶ 46.) When questioned, Plaintiff denied that he was Harris, but did not have any identification on his person. (Pl.'s 56.1(b) ¶¶ 27-28.)

As it turned out, Detective Poradzisz was wrong. Nonetheless, that mistake does not make

him liable. "The peril of liability under section 1983 should not be placed upon arresting officers every time they are faced with the practical dilemma of arresting or releasing an individual who, despite some discrepancies in description, they reasonably believe to be the intended subject." *White v. Olig*, 56 F.3d 817, 820 (7th Cir. 1995) (citation and quotations omitted). When making an arrest, the Fourth Amendment does not require certainty, but instead "sufficient probability" that the person arrested is the person sought. *Hill*, 401 U.S. at 804. Here, the officers had reliable information that Harris would be in classroom D226 at the precise time they confronted Plaintiff. Further, Plaintiff sufficiently matched the description of Harris to make the officers' mistake understandable and the arrest reasonable under the circumstances. When a mistaken detention or arrest was a reasonable response to the situation facing the police officer at the time, there is no Fourth Amendment violation. *Id*.

Plaintiff also argues that the use of handcuffs during the arrest was unreasonable. (Pl.'s Mem. in Opp'n to Vill. Defs.' Mot. for Summ. J. [45-9] at 6-9; Pl.'s Mem. in Opp'n to Harper Coll. Defs.' Mot. for Summ. J. at 4.) The use of handcuffs during the course of a valid arrest does not, by itself, violate the Fourth Amendment. "An officer who has the right to arrest an individual also has the right to use some degree of physical force or threat of force to effectuate the arrest . . . ." *Stainback v. Dixon*, 569 F.3d 767, 772 (7th Cir. 2009) (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)). The Seventh Circuit has even recognized that the use of handcuffs, "and other measures of force more traditionally associated with arrests may be proper during an investigatory detention, depending on the circumstances." *United States v. Bullock*, 632 F.3d 1004, 1016 (7th Cir. 2011). An officer may use handcuffs to carry out an arrest so long as the handcuffs are not knowingly used "in a way that will inflict unnecessary pain or injury on an individual who presents little or no risk of flight or threat of injury." *Stainback*, 569 F.3d at 772 (citation omitted).

Plaintiff testified that his handcuffs were too tight and that they hurt; however, he also admits that he never brought this to the officers' attention and that he did not suffer any injuries. (Palmore-

Lett Dep. 35:20-36:22.) An officer is not "expected to accommodate an injury that is not apparent or that otherwise has not been made known to him." *Stainback*, 569 F.3d at 773 (citing *Tibbs v. City of Chicago*, 469 F.3d 661, 666 (7th Cir. 2006) (An arresting officer did not act unreasonably when he fastened the plaintiff's handcuffs too tightly, and the plaintiff, whose injuries did not require medical care, complained only once about the handcuffs.)). Further, the officers immediately took action to determine whether Plaintiff was indeed the suspect sought and released him as soon as they received confirmation that he was not. As a result, Plaintiff remained handcuffed for approximately ten minutes. The immediate effort to identify Plaintiff and the brevity of the encounter bolster the conclusion that the officers' conduct was reasonable.

**II.    Qualified Immunity**

Defendants also argue that the officers should be shielded from liability based on qualified immunity. As the court has determined that the officers had probable cause to arrest Plaintiff, this argument requires only brief discussion. Qualified immunity shields an officer from liability unless: (1) the officer violated the plaintiff's constitutional rights; and (2) those rights were clearly established when the officer acted. *Moss v. Martin*, 614 F.3d 707, 709 (7th Cir. 2010). "Qualified immunity shields public officials from liability when they act in a manner that they reasonably believe to be lawful." *Gonzales*, 578 F.3d at 540 (citing *Anderson v. Creighton*, 483 U.S. 635, 638-39 (1987)). "The doctrine allows 'ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.'" *Gonzales*, 578 F.3d at 540 (quoting *Hunter v. Bryant*, 502 U.S. 224, 229, 112 S. Ct. 534 (1991)).

In an unlawful arrest case in which the defendants raise qualified immunity as a defense, this court will "determine if the officer actually had probable cause or, if there was no probable cause, whether a reasonable officer could have mistakenly believed that probable cause existed." *Humphrey v. Staszak*, 148 F.3d 719, 725 (7th Cir. 1998). "The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular

[official] conduct . . . ." *Saucier v. Katz*, ___ U.S. ___, 121 S. Ct. 2151, 2158 (2001). "If the [official's] mistake as to what the law requires is reasonable . . . the [official] is entitled to the immunity defense." *Id*.

In this case, the Plaintiff has not cited, and the court has not found, a case holding precisely that a detention or arrest under the circumstances the officers encountered would be plainly illegal. *Snyder v. Nolen*, 380 F.3d 279, 290 (7th Cir. 2004) ("The plaintiff bears the burden of establishing the existence of a clearly established constitutional right."). Thus, even if probable cause were lacking, the court cannot say that reasonable officers in the Defendants' position would not have believed that they had authority to detain or arrest Plaintiff. Accordingly, under the circumstances present here, the officers are shielded from liability based on qualified immunity.

## III. *Monell* Claims

Counts IV and VIII are *Monell* claims against the Village of Schaumburg and Harper College respectively. Because the individual officers are not liable, Plaintiff does not have a claim against these entities. *Proffitt v. Ridgway*, 279 F.3d 503, 507 (7th Cir. 2009) (citing *City of L.A. v. Heller*, 475 U.S. 796, 799 (1986)). Indeed, in response to the Defendants' motions, Plaintiff concedes that Defendants are entitled to summary judgment on these Counts. (Pl.'s Mem. in Opp'n to Vill. Defs.' Mot. for Summ. J. at 12; Pl.'s Mem. in Opp'n to Harper Coll. Defs.' Mot. for Summ. J. at 8.)

## CONCLUSION

The Defendants' motions for summary judgment are granted as to all Counts.

ENTER:

Dated: October 24, 2012

_____
REBECCA R. PALLMEYER
United States District Judge